UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11813-GAO

MARIA I. MARQUES,
Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
Defendant.

OPINION AND ORDER
March 6, 2012

O'TOOLE, D.J.

The plaintiff, Maria I. Marques, pursuant to 42 U.S.C. § 405(g), appeals the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Marques' application for a period of disability and Disability Insurance Benefits ("DIB"). Marques applied for a period of disability and DIB in April 2008, (Administrative Tr. at 108 [hereinafter R.].), alleging disability beginning November 16, 2007. (Id. at 7.) Her application was denied initially and on reconsideration. (Id. at 64, 71.) Marques requested a hearing, which was held before an Administrative Law Judge ("ALJ") on March 30, 2010. (Id. at 29, et seq.) The ALJ found the plaintiff was not disabled and denied her claim for disability benefits. (Id. at 19.) The Disability Review Board ("DRB"), failed to complete its review on time, (id. at 1), rendering the ALJ's decision the final decision of the Commissioner. Before the Court are cross-motions to reverse and, alternatively, affirm the decision of the Commissioner. Concluding that administrative record substantially supports the ALJ's decision and that no error of law was made, the Court now affirms.

**I.**     **Background**

Marques was fifty-two at the onset of claimed disability. (Id. at 34.) She has a fourth grade education, (id. at 35), and last worked as a pre-school teacher's assistant in a day care center. (Id. at 36-37). She was injured on the job on November 16, 2007, (id. at 493, 532, 716), and has not engaged in substantial gainful employment since. (Id. at 9.) Previously, she worked as a stitcher sewing collars to coats. (Id. at 37, 157.) Marques claims disability due to back injury, diabetes, arthritis, high cholesterol, carpal tunnel syndrome, a heart condition, osteoporosis, depression, and anxiety. (Id. 156.)

   A.     Medical History

Marques was diagnosed with diabetes mellitus on December 15, 2006, by Dr. Altschuller. (Id. at 239.) In June 2007, Dr. Altschuller noted that her blood sugars had markedly improved and that she had no cardiopulmonary symptoms. (Id. at 235.) Both Dr. Althschuller and Dr. Lukacova-Zib recommend that Marques exercise and lose weight. (Id. at 237, 264.)

On August 8, 2007, Dr. Lukacova-Zib noted that although Marques' type 2 diabetes was "moderately well controlled," she still had "some elevated morning sugars." (Id. at 233). On October 10, 2007, Dr. Altschuller noted that Marques' blood sugar was at an "excellent" 128, after a month of exercising and careful eating. (Id. at 264.)

On November 16, 2007, Marques was sliding a cart or cot under a crib at the day care center where she worked, when she felt a "pop" and experienced sudden severe pain in her lower back. (Id. at 389, 493, 494, 532, 716.) She was treated by Dr. Patel, who diagnosed a lumbar spine sprain and dislocation and prescribed pain medications. (Id. at 494.) Dr. Patel advised limiting her work to seven days of "light duty" and restricted lifting, carrying, pushing and pulling to a range of six to ten pounds. (Id. at 494.) At a follow-up appointment the following week, Marques complained of severe back pain and physical examination revealed that Marques'

range of motion was decreased, there was marked tenderness, and movement was difficult. (Id. at 497.) Dr. Patel gave her an injection of Toradol and Vistaril for the pain, and gave her a note authorizing her to stay out of work for five days. (Id.) At a follow-up appointment a week later, Marques continued to complain of severe back pain. (Id. at 500.) Physical examination revealed numbness in the flank, straight leg raising of thirty degrees in the left leg and forty-two degrees in the right leg. (Id.) Dr. Patel prescribed Vicodin and Phenargan, and ordered a magnetic resonance imaging scan ("MRI"). (Id.) Five days later, the MRI revealed "mild lumbar spondylosis," a "disc desiccation with mild right-sided discogenic endplate reactive marrow changes," and a "minimal concentric disc bulge" at L5. (Id. at 259-60.) The MRI also revealed that a disc bulge at L4-L5 caused a mild flattening of the ventral thecal sac and a mild narrowing of the central canal. (Id.) Dr. Patel prescribed more pain medication and another ten days out of work. (Id. at 503.)

At an appointment on February 11, 2008, Dr. Altschuller noted that Marques' biggest complaint had been back pain and that she had spinal stenosis. (Id. at 265.) He also noted that she found it difficult to ambulate because of discomfort and had gained back six pounds, but that her sugars remained fairly good. (Id. at 265.)

Marques continued to complain of severe back pain. Dr. Patel provided her with a note to stay out of work for twelve days, citing "marked tenderness" and the "range of motion is decreased". (Id. at 506.) Dr. Patel provided her with notes authorizing absence from work for successive periods until February 29, 2008. (Id. at 506, 508, 510, 512, 514, 517, 521, 524.) On February 29, 2008, Dr. Patel authorized Marques to return to "floor level work" sometime in

early March[1] with lifting, carrying, and pushing/pulling limits of six to ten pounds, and a restriction on reaching below the waist. He also prohibited work requiring repeated stooping, crawling, kneeling or cramped positions and limited continuous walking or standing to twenty minutes. (Id. at 528.)

On March 10, 2008, Dr. Patel noted that Marques continued to complain of severe lower back pain and that there was marked tenderness. (Id. at 529.) Dr. Patel prescribed more Percocet and a lumbar support belt to wear daily. (Id.) The next day, Marques reported that she tried to return to work, but was denied light duty. (Id. at 293). Dr. Patel advised complete bed rest and staying out of work for ten more days. (Id.) While she was being treated by Dr. Patel, Marques also underwent four courses of chiropractic treatment, (id. at 440, et seq.), three times a week each. (Id. at 442, 452, 466, 480.)

On February 5, 2008, Marques underwent a neurosurgical consultation with Dr. Okpaku. (Id. at 407, 408, 585.) Dr. Okpaku noted that Marques had reported that, while the left leg pain associated with her injury had improved, she had experienced a sudden onset of severe right leg pain during chiropractic manipulation two month ago. (Id. at 407.) Dr. Okpaku recommended continued physical therapy and the possibility of beginning an antispasmodic. (Id.) After completing her physical therapy regimen, Marques returned for a follow up with Dr. Okpaku on April 4, 2008, during which Marques reported a persistent numbness in her right leg and asserted that physical therapy had not improved her condition. (Id. at 405.) Dr. Okpaku found decreased sensation in the L5 distribution of her right leg and expressed concern over her "worsening"

---

[1] The exact date that Dr. Patel intended for Marques to return to work is unclear because he both checked off the "Return to Supervisor with Restriction (above)" box and wrote next to it "3/3/08" and wrote on the line above "2/29/08 to 3/9/08." (Id. at 258.) Additionally, it is unclear if Marques actually returned to work on either on March 3, 2008 or during February 29, 2008 to March 9, 2008.

neurological exam. (Id.) Dr. Okpaku recommended epidural injection or decompression surgery, and provided Marques with a note authorizing her to stay out of work for a month. (Id. at 406, 583.)

On May 29, 2008, Marques underwent surgery for right hemilaminectomy at L4-L5 for lateral recess decompression. (Id. at 306-307, 586.) Dr. Okpaku noted on her first postoperative visit, on June 10, 2008, that Marques reported essentially no right leg pain and some mild back pain. (Id. at 586.) On a July 7, 2008 visit, Marques reported very minimal leg pain but still had some numbness in the L5 distribution. (Id.) Dr. Okpaku recommended continued physical therapy and Motrin and Flexeril for the mild back pain. (Id.) On August 1, 2008, Dr. Okpaku noted that Marques continued to have some persistent low back pain. (Id.)

In July 2008, Marques attended a consultation with Dr. Hait in a rheumatology clinic. (Id. at 339.) Dr. Hait noted that Marques complained of bilateral aching hip pain, which was worse when sitting down. (Id. at 339.) He diagnosed osteoarthritis of the spine, without inflammatory joint disease and prescribed Etodolac for the pain. (Id. at 339.) On September 9, 2008, Dr. Hait noted that a MRI in August 2008, revealed multilevel disc disease with small annular tear at L5-S1 and mild central stenosis at L4-5 (Id. at 409). He prescribed a Lidoderm patch (Id. at 409, 411.)

Marques underwent physical therapy from July 2008 to September 2008 (id. at 577), three times a week for four weeks followed by twice a week for four weeks. (Id. at 532.)

On September 8, 2008, Dr. Okpaku noted that Marques reported no leg pain at all, but did report occasional pain in the lower back near the incision site with certain movements. (Id. at 398.) Upon physical examination, Dr. Okpaku found that her motor strength was 5/5, although she appeared to have "some slight EHL weakness of the right, which [was] present

5

intermittently." (Id.) Dr. Okpaku opined that her mild back pain was to be chronic to some degree and recommended that she continue her home physical therapy and exercise regimen. (Id.)

On February 25, 2009, Dr. Okpaku noted that Marques continued to have persistent mild low back pain and recommended evaluation by physiatry for possible steroid injections in the lumosacral junction or SI joint. (Id. at 589.) He referred Marques to Dr. Ananta who found that Marques suffered from mechanical low back pain secondary to facet dysfunction (id. at 574, 575), and recommended Lidoderm patches, home exercises, and possible facet injections (Id. at 575). In April 2009, Marques was treated in the emergency room for elevated blood sugar after experiencing an allergic reaction to the facet injections. (Id. at 560, 561, 563, 570.) She was treated with two units of insulin. (Id. at 570.)

On July 1, 2009, Dr. Okpaku concluded that Marques had no significant radicular symptoms, but did have some mild arthritic pain in the lumbar spine. (Id. at 590.) Marques informed him that Lidoderm patches had been only minimally useful, so Dr. Okpaku advised her to discontinue the Lidoderm patches and instead prescribed Skelaxin. (Id.) She resumed taking the Lidoderm patches at some point.

In March 2010, Marques was treated for back pain at Southcoast Hospital Group by nurse practitioner Susan Jenkins. (Id. at 711.) She was prescribed ice, Ibuprofen, and Skelaxin, and referred to Dr. Klein for follow up care. (Id.)

B.    Evaluations

On May 27, 2008, Dr. Jao, a Disability Determination Services ("DDS") review physician reviewed the record and completed a residual functional capacity assessment. (Id. at 297-304.) Dr. Jao opined that Marques could lift and carry ten pounds frequently and twenty

pounds occasionally; could sit, stand, and walk for six hours in an eight hour day; could push and pull hand and foot controls within the lift and carry weight limit; and could occasionally climb, balance, stoop, kneel, crouch, and crawl (id. at 298-99); but had to avoid concentrated exposure to hazards such as machinery and heights. (Id. at 301.) He noted that she had "low back pain radiating to back [sic]," and that there was no evidence of secondary complications associated with her diabetes, no evidence of a heart condition, carpal tunnel syndrome, and that she had osteopenia by bone density. He found her "partially credible" because "[s]ome allegations [were] not supported by objective findings." (Id. at 298-99.)

Dr. Gibbons performed a worker's compensation independent medical examination of Marques on August 21, 2008. (Id. at 721.) Dr. Gibbons opined that on September 29, 2008, Marques could return to work with light duty and other restrictions. (Id. at 722.) He noted that she could return to full duty without restriction on November 29, 2008. (Id.) Dr. Gibbons examined Marques again on November 3, 2008. (Id. at 723-725). Marques reported pain in the left buttock radiating into her thigh. (Id. at 723.) Dr. Gibbons found that although her subjective complaints were consistent with a diagnosis of sciatica, there was no objective evidence of active organic disease. (Id. at 724.) Dr. Gibbons posited that Marques was able to return to her job at the day care center, where she could lift infants but not toddler, noting that her job was "mainly supervisory in nature."[2] (Id. at 724.) At a follow up examination on May 4, 2009, Dr. Gibbons indicated that he thought that Marques needed no further treatment and was capable of returning to work with a lifting restriction of twenty-five to thirty pounds. (Id. at 728.)

---

[2] Marques points out her job was not "mainly supervisory in nature" as Dr. Gibbons states, and he did not correct his error in his subsequent report. (Pl.'s Mem. in Supp. of Her Mot. to Reverse the Decision of the Commissioner 10 (dkt. no. 9) [hereinafter Pl.'s Mem.].)

On October 27, 2008, Dr. Kriston completed a residual functional capacity assessment of Marques. (Id. at 414-21.) Dr. Kriston opined that Marques could lift and carry ten pounds frequently and twenty pounds occasionally; could sit, stand, and walk for six hours in an eight hour day; could push and pull hand and foot controls within the lift and carry weight limit, (id. at 415); and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id. at 416.)

In January 2008, Dr. Galvin performed an independent medical exam on Marques. (Id. at 716). Dr. Galvin concluded that she had sustained an injury to her low back on November 16, 2007, and has a "small herniatec disk" which, if continued to be treated "conservatively," should continue to improve. (Id. at 718.) Although he opined that she had a work capacity, he also noted that she needed to avoid lifting over five to ten pounds and frequent bending. (Id.)

Marques was examined by Dr. Broome on August 19, 2008 (Id. at 389.) Dr. Broome observed that she had a "notable flattening of her lumbar lordosis" and "notable paraspinous spasm bilaterally in the lumbar area." (Id. at 392.) He also noted that she had some weakness of extension of her right great toe, which indicated involvement of the L5 nerve root. (Id.) He opined that she had physical limitations as to her ability to lift, stand or sit for any prolonged period of time and concluded that the disc rupture, ongoing pain, paraspinous spasm and weakness of extension of her great toe meant that she was unable to work. (Id. at 392-93).

On July 17, 2008, DDS referred Marques to Dr. Sokol for a psychodiagnostic interview. (Id. at 334-38.) Dr. Sokol noted that Marques was "being medicated by her primary care physician with Lexapro and [A]lprazolam." (Id. at 335.) Dr. Sokol concluded that Marques' vocational functional capacities from a psychological standpoint were that she was able to follow and understand simple directions and instructions and perform simple rote tasks under ordinary supervision. (Id. at 337.) He found that her capacity to maintain attention and concentration for

job-related tasks, as well as her ability to perform job tasks at a consistent pace were both moderately impaired. (Id.) Her ability to relate adequately with coworkers, supervisors, and the general public was mild to moderately impaired. (Id.) He diagnosed her with major depressive disorder without psychotic features, which was recurrent and mild to moderate. (Id.)

On August 12, 2008, Dr. Kasdan reviewed Dr. Sokol's evaluation, (id. at 373), and opined that Marques was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for an extended period, (id. at 371), to complete a work day and work week without interruption from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond to changes in the work setting. (Id. at 372.) Dr. Kasdan also opined that Marques was moderately limited in her ability to respond appropriately to changes in work setting. (Id.)

On November 3, 2008, Dr. Daniels also reviewed Dr. Sokol's evaluation, and opined that Marques was moderately limited in her ability to understand and remember detailed instructions, to maintain attention and concentration for an extended period, (id. at 436), to complete a work day and work week without interruption from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond to changes in the work setting. (Id. at 437). Dr. Daniels concluded that although sustained concentration, attention, performance and adaptation were all interfered with to a significant extent, Marques was still able to manage simple tasks for two hour periods on a sustained basis. (Id. at 438.)

On March 11, 2010, Marques' primary care physician, Dr. Treadup, opined that Marques' combination of impairments of chronic low back pain, osteopenia of the hips,

9

osteoporosis of the spine, diabetes, hypertension, hypercholesteremia, anxiety and depression, and her regimen of medications, (id. at 663), resulted in an inability to sit, stand or walk for more than fifteen or twenty minutes in an eight hour day; limited her ability to lift and carry to ten pounds on an occasional basis; precluded repetitive pushing and pulling with her arms; limited the operation of foot controls to thirty minutes; limited bending and squatting to occasionally; and precluded kneeling, crawling, and exposure to unprotected heights, moving machinery, noise, vibration, and extreme temperatures. (Id. at 666.) Dr. Treadup completed a pain questionnaire form in which she indicated that the "significant" "chronic low back pain" Marques suffered was of such severity as to preclude sustained concentration and productivity, would produce good days and bad days, and would likely cause Marques to be absent from work more than four days a month. (Id. at at 665.) Dr. Treadup concluded that Marques could not sustain competitive employment on a full-time, ongoing basis. (Id. at 664.)

At the request of the ALJ, vocational expert Paul Maryville[3] testified at the ALJ hearing. (Id. at 51.) The vocational expert categorized Marques' past relevant work of child care worker and stitcher as light and unskilled. (Id. at 51-52.) The ALJ then proposed two hypothetical questions to the vocational expert. In response to the first hypothetical, the vocational expert testified that if all of Marques' testimony was accurate, then there would be no jobs that she could do. (Id. at 53.) In response to the second hypothetical, which was based on the state agency physicians' assessments, assuming a person who could lift and carry ten to twenty pounds; sit, stand, and walk for six hours; occasionally climb, balance, stoop, kneel, crouch, crawl; perform simple routine tasks of a repetitive nature with simple decision-making and no complex detailed tasks, the vocational expert stated the job of stitcher could be preformed. (Id. at 53-54.) On cross-

---

[3] The plaintiff identifies the vocational expert as "Paul Murgo" as opposed to "Paul Maryville." (Pl.'s Mem. 12.)

10

examination, the vocational expert acknowledged that a person with the limitations described in Dr. Treadup's assessment would not be able to work. (Id. at 55.)

Following the hearing, the ALJ found that Marques has the severe impairments of diabetes mellitus, obesity, status post lumbar laminectomy, and depression. (Id. at 9.) The ALJ found Marques has the residual functional capacity to perform less than the full range of light work, finding that she can lift and carry up to twenty pounds occasionally and ten pounds frequently; sit, stand and walk for six hours in an eight hour day; occasionally climb, balance, stoop, kneel, crouch or crawl; that she may not be exposed to dangerous heights or machinery; and needs to work in a non-pressured work environment where she could perform simple repetitive and competitive tasks on a sustained basis over an eight hour day in a stable work environment. (Id. at 11). He further found that Marques retained the residual functional capacity to perform her past relevant work as a stitcher, (id. at 18), as well as a number of unskilled light jobs, (id. at 19), and concluded that Marques was not disabled. (Id.)

## II. Standard of Review

If findings of fact by the Commissioner are "supported by substantial evidence," then they are considered "conclusive." 42 U.S.C. § 405(g). "In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.'" Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st. Cir. 1981) (quoting Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965)) (internal punctuation omitted). Additionally, "[i]t is the Secretary's province to resolve conflicts in the medical evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 4 (1st Cir. 1987) (quoting Lizotte v. Sec'y of Health & Human Servs., 654 F. 2d 127, 128 (1st. Cir. 1981)). The ALJ's findings must be upheld

"if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez, 647 F.2d at 222-23 (internal citation omitted). If substantial evidence is present, then the ALJ's "resolution" must be affirmed, "even if the record arguably could justify a different conclusion." Pagan, 819 F.2d at 3 (quoting Lizotte, 654 F.2d at 128)). However, the ALJ's findings of fact are "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

### III.     Legal Analysis

Marques argues that the ALJ 1) improperly rejected her disabling pain and functional limitation; 2) improperly rejected the assessment of her treating physician, Dr. Treadup, in favor of an assessment by DDS review physicians; 3) erred in relying on the testimony of the vocational witness; and 4) improperly denied her a period of closed disability.

In response to Marques' specific allegations, the defendant argues that the ALJ properly: 1) evaluated the Marques' credibility; 2) declined to accord persuasive weight to Dr. Treadup's opinion primarily because it conflicted with the record as a whole; 3) relied on the vocational expert because Marques failed to raise any objections to the expert's testimony during cross-examination; and 4) refused to grant a period of closed period of disability because Marques could not establish a twelve-month period of disability.

#### A.     Credibility Determination

First, Marques argues that the ALJ lacked substantial evidence to conclude that she did not suffer from disabling pain or have functional limitations, and that medical evidence fully corroborates her claim of disabling pain. The ALJ wrote the following regarding Marques' credibility:

> [a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could not reasonably be expected to cause the alleged symptoms to the degree alleged and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. The medical evidence here does not fully support the claimant's complaints and allegation of disability.

(R. at 12.)

If there is objective evidence on the record indicating that the claimant has "a medically determinable impairment(s) that could reasonably be expected to produce . . . symptoms, such as pain" the ALJ "must then evaluate the intensity and persistence of . . . [the] symptoms" to "determine how . . . [the] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §404.1529(c)(1). The following factors should be considered when evaluating a claimant's subjective complaints:

> 1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
> 2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
> 3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;
> 4) Treatment, other than medication, for relief of pain;
> 5) Functional restrictions; and
> 6) The claimant's daily activities.

Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). Because "[t]he regulations place much weight on objective evidence . . . the ALJ may disregard subjective claims of pain if they are unsubstantiated and he does not credit them." Mills v. Apfel, 244 F.3d 1, 7 (1st Cir. 2001) (citing 20 C.F.R. § 416.929). If the ALJ finds that the claimant's subjective claims are not credible,

> [t]he determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *2 (1996). The ALJ's credibility determination "is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).

   i.  Physical Impairments

Although Marques alleges that the severity of her back pain renders her unable to work, Marques actually reported an improvement in her back pain after surgery and chiropractic treatment. (R. at 13, 716.) Additionally, Dr. Gibbons found that Marques could return to work and had reached a medical end result for the injuries suffered on November 16, 2007. (Id. at 725, 728) After her surgery, Dr. Okpaku consistently noted that Marques' back pain was occasional or mild instead of severe. (Id. at 398, 589, 590.)

Although Drs. Treadup and Broome indicated that Marques' back pain was severe, a reasonable mind could nevertheless conclude that the ALJ relied upon substantial evidence, based on the reports of the other doctors, to conclude Marques was experiencing only symptoms of mild back pain, and thus the degree of limitation she alleges is excessive.

Marques also complains of severe leg pain. As the defendant correctly point out, "treatment notes show that Plaintiff's leg pain resolved after undergoing decompression surgery at L4-L5 in May 2008." (Def.'s Mem. of Law in Supp. of Mot. for Order Affirming the Decision of the Commissioner 14 (dkt. no. 12) [hereinafter Def.'s Mem.].) Thus, while it is true that Marques reported the sudden onset of severe right leg pain during chiropractic manipulation sometime in December 2008, (R. at 407), after her surgery, Marques' leg pain was mild, and then essentially resolved. (Id. at 400, 398.) Therefore, the ALJ did not err in finding that Marques' leg pain did not result in the degree of functional limitation that Marques alleges.

Marques lists diabetes mellitus as one of the factors contributing to her disability. The defendant argues that the record demonstrates that the disease was moderately well controlled and that Marques' own failure to follow the prescribed treatment undermines the credibility of her subjective complaints. (Def.'s Mem. 15.) It is true that Marques was repeatedly advised to lose weight and exercise, (R. at 16, 234-37, 239, 248, 250, 257, 261, 263-65, 272, 275, 358, 360, 367, 398, 560-61), and that on August 8, 2007, Dr. Atschuller noted that her type 2 diabetes was "moderately well controlled" (although he also noted that she still had "some elevated morning sugars." (Id. at 233.)) On October 10, 2007, Marques' blood sugar was excellent. (Id. at 264). The foregoing evidence suggests that the ALJ did not err in finding that Marques' diabetes mellitus did not result in severe functional limitations.

      ii.      Mental Impairments

Marques also lists "depression" and "anxiety" as factors contributing to her disability. The defendant correctly points out that Marques was never treated by a mental health professional for these illnesses. (Id. at 335.) Dr. Sokol, who conducted a psychodiagnostic interview with Marques, diagnosed her with major depressive disorder without psychotic features, which was recurrent and mild to moderate, and concluded that she only suffered from moderate impairments to her vocational functional capacity. (Id. at 337.) The defendant notes that "[a]t the consultative examination by Dr. Sokol, Plaintiff's mood and affect were depressed, but she was cooperative, her speech was intelligible and fluent, her thought processes were coherent and goal-directed, and she was fully oriented." (Id. at 16, 336.)

Drs. Kasdan, who reviewed Dr. Sokol's evaluation, (id. at 373, 436), also noted moderate impairments and no major limitations to Marques' psychological ability to function effectively in the work place. (Id. at 373.) Dr. Daniels concluded that Marques was able to manage simple

tasks for two hour periods on a sustained basis. (Id. at 438.) The evaluations of Drs. Sokol, Kasdan, and to a lesser extent, Daniels, do not support Marques' alleged limitations resulting from depression or anxiety, and thus the ALJ did not err in assessing her functional capabilities with regards to her psychological capacity.

### iii. Daily Activities

The defendant additionally argues that Marques' claims of impairment were belied by her daily activities. In her testimony, Marques stated that she sees her grandchildren weekly, (id. at 35), helps with laundry, shops with her husband, and watches television. (Id. at 45.) She also reported that she daily prepares simple meals, (id. at 134), goes outside into the yard about three to four times a day, drives short distances, (id. at 135), reads the bible, showers with assistance from her husband, (id. at 178), and talks to her children and grandchildren "usually once a day." (Id. at 182.) The ALJ did not err in concluding that these daily activities contradict Marques' claims of disabling pain.

Because Marques' subjective complaints are inconsistent with medical evidence and her daily activities, the ALJ did not err in concluding that her medically determinable impairments of back pain, diabetes mellitus, and depression did not result in the degree of limitation that Marques alleges.

### B. Treating Physician

Second, Marques argues that Dr. Treadup's assessment, as treating physician, should not have been dismissed because it was not merely conclusory but "detailed and based on longitudinal records of years of treatment." (Pl.'s Mem. 16.)

The defendant argues that the ALJ properly declined to accord persuasive weight to Dr. Treadup's opinion because it was inconsistent with the record as a whole. (R. at 17.) More

specifically, the defendant argues that: 1) Dr. Treadup's assessment was inconsistent with that of other physicians; 2) her own notes did not support the assessment; and 3) her diagnosis was not supported by objective medical evidence such as tests.

It is the province of the ALJ to make determinations of disability. 20 C.F.R. § 416.927(e)(1); Rodriguez, 647 F.2d at 222. Although the treating physician's opinion is usually given controlling weight, the First Circuit does not require that this be the case. Arroyo v. Sec'y of Health & Human Servs. 932 F.2d 82, 89 (1st Cir. 1991) (citing Tremblay v. Sec'y of Health & Human Servs., 676 F.2d 11, 13 (1st Cir.1982)). The treating physician's opinion is given controlling weight if the "opinion on the issue(s) of the nature and severity of [the plaintiff's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). The weight that is given to the opinions of non-treating physicians "will vary with the circumstances, including the nature of the illness and the information provided [to] the expert [or non-treating physician]." Rodriguez, 647 F.2d at 223-24 (citation omitted).

First, the ALJ noted that Dr. Treadup's assessment, in which Dr. Treadup indicated that Marques' impairments prevented her from being able to sustain competitive employment on a full-time, ongoing basis, (id. at 664), was inconsistent with the assessments of Drs. Galvin, Gibbons, Patel, Okpaku, and the state agency physicians. (R. at 17.) In contrast to Dr. Treadup, Dr. Galvin, who performed an independent medical examination of Marques in January 2008, (id. at 716), opined that Marques had a work capacity, but that she needed to avoid lifting over five to ten pounds and frequent bending, and that if she continued to be treated "conservatively," should continue to improve. (Id. at 718.) Similarly, Dr. Gibbons, who performed a worker's

compensation independent medical examination of Marques, indicated, in May 2009, that he thought that Marques need no further treatment and was capable of returning to work with a lifting restriction of twenty-five to thirty pounds.[4] (Id. at 728.) Like Drs. Galvin and Gibbons, in February 2008, Dr. Patel released Marques to return to work with restrictions. (Id. at 528, 529, 531.)

On May 27, 2008, Dr. Jao concluded that Marques could perform "light work," based on his review of the record. (Id. at 299.) In contrast to Dr. Treadup, Dr. Jao opined that Marques lift greater amounts of weight, more frequently, (id. at 298); sit, stand or walk for hours rather than minutes, (id.); push and pull hand and foot controls within the lift and carry weight limit, (id. at 298-299); and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id.) Unlike Dr. Treadup, Dr. Jao opined that Marques only had to avoid concentrated exposure to hazards such as machinery and heights, and not noise, vibration, and extreme temperatures. (Id. at 301.)

Drs. Galvin, Gibbons, and Patel all made findings which supported their conclusion that Marques had the ability to return to work in some capacity. In addition, the findings of Dr. Jao, the non-treating physician, conflicted with that of the treating physician. Because the ALJ is not legally bound to give controlling weight to the treating physician in light of this conflicting evidence on the record, it was within the authority of the ALJ to rely on the opinions of the state physician to conclude that Marques was not disabled.

Next, the defendant argues that Dr. Treadup's own treatment notes do not support the degree of limitation that Dr. Treadup alleges. (R. at 17, 697-698, 701-702, 704-705, 707-708). Additionally, because Dr. Treadup only specifically cites the November 2007 MRI, taken after Marques injured her back, (id. at 665), her assessment is not "well-supported by medically

---

[4] However, Marques points out that Dr. Gibbons made his assessment based on the erroneous assumption that her job was "mainly supervisory in nature." (Pl.'s Mem. 1.)

18

acceptable clinical and laboratory diagnostic techniques." Finally, contradictory assessments by other physicians render Dr. Treadup's assessment inconsistent "with the other substantial evidence in [the] case record." Therefore, the ALJ did not err in declining to afford probative weight to Dr. Treadup's assessment.

### C. Vocational Witness

Third, Marques argues that the ALJ failed to identify and obtain a reasonable explanation for the conflict between the vocational expert's testimony and the Dictionary of Occupational Titles. The defendant is correct in arguing that because Marques' attorney was given an opportunity to cross-examine the vocational expert and neglected to raise the objection, Marques is barred from raising it at trial. See Mills, 244 F. 3d at 8. Therefore, the ALJ did not err by relying on the vocational expert's testimony.

### D. Closed Period of Disability

Finally, Marques argues that the she is entitled to "at least a closed period of disability" because her original injury "would meet the twelve month duration requirement for a period of disability." (Pl.'s Mem. 17.) However, the burden of proof is on the plaintiff to put forth evidence demonstrating that her impairments meet or equal one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. Dudley v. Sec'y. of Health and Human Servs., 816 F.2d 792, 793 (1st Cir. 1987) (per curiam). Here, because it is uncertain whether Marques can even theoretically establish a twelve month period during which she was advised to refrain from working by medical doctors,[5] the ALJ did not err in denying her a closed period of disability.

---

[5] She was injured on November 16, 2007. From November 16, 2007 until February 29, 2008, Dr. Patel provided authorization for Marques to stay out of work. On February 29, 2008, Dr. Patel authorized Marques to return to "floor level work" sometime in early March with restrictions. (Id. at 528.) On March 11, 2008, Marques reported that she tried to return to work, but was denied light duty. (Id. at 293). Dr. Patel advised complete bed rest and staying out of work for ten more days. (Id.) On April 4, 2008, Dr. Okpaku, Marques' neurosurgeon, opined that

**IV.     Conclusion**

For the foregoing reasons, the Plaintiff's Motion to Reverse the Decision of the Commissioner (dkt. no. 8) is DENIED and the Defendant's Motion to Affirm the Commissioner's Decision (dkt. no. 11) is GRANTED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

---

she was unable to return to work for an additional month. (Id. at 406, 583). It appears that Marques did not have medical authorization to refrain from working from ten days after March 11 to April 4. On May 29, 2008, Marques underwent surgery. (Id. at 586.) It further appears that Marques did not have authorization to refrain from working from a month from April 4 (sometime in early May) until May 29, when she underwent the surgery. After the surgery, Dr. Gibbons advised light duty beginning September 29, 2008 and full duty without restrictions beginning November 29, 2009. (Id. at 722.) At a subsequent exam on November 3, 2008, Dr. Gibbons, noting (erroneously Marques contends) that her job was "mainly supervisory in nature," authorized Marques to return to work. (Id. at 723-25.) This authorization would create another gap in the twelve month period that Marques seeks to establish in order to qualify for a closed period of disability.